Mr. Chief Justice Watkins delivered the opinion of the Court This cause was before this court, and decided at October term, 1845. The allegations in the bill, and the answer of Alexander, .are stated in the report of the case in 1 Eng. 302. Upon the remanding of the cause, the death of Morse was suggested, and his administrator substituted as defendant, who answered, admitting the sale and conveyance of the three tracts of land, by his intestate to the complainants, with warranty of title, and for the consideration as stated in their bill, and that one of the tracts, as stated in the bill, was held by Saugrain, by virtue of his having entered it at the land office at Fayetteville, previous to the sale and conveyance from Morse to the complainants; denying that Morse, his intestate, had represented to the complainants that he had a good and valid title to the several tracts of land referred to, or that he had a right to convey the same, alleging, upon information and belief, that, at the time Morse made the conveyance to the complainants, they knew of the previous entry of one of the tracts by Saugrain, and of the contest between that entry and the one subsequently made by Morse, at the land office at Clarksville, made enquiries concerning it, knew that the matter was undergoing an investigation before the Commissioner of the General Land Office, and was convinced that Saugrain’s entry would be set aside. The answer further alleged that, after the entry made by Morse had been set aside by the Commissioner of the General Land Office, the complainants applied at the land office for the purchase money of the tract which had been entered by Saugrain to be refunded, and the money, amounting to $150, waspaidto them, and that they applied for and obtained the money upon the ground that Morse had conveyed t'he tract of land in question to them. The answer further stated that, after the filing of the bill, and after the death of Morse, the defendant, as administrator, had sued the complainants upon another note for the residue of the purchase money due by the complainants, for the lands of Morse, and that by agreement he"took of the complainants a lot in the town of Clarksville, worth $40, in satisfaction of the demand. The cause was submitted upon the bill, answers, replications, and depositions. The only facts in evidence are, that, at the time of the conveyance by Morse to the complainants, the tract of land which Saugrain had entered (the one to which the title failed) was worth $1,200, and that, at the time of the filing of the bill in August 1843, Morse (the intestate) was in failing circumstances, and af-terwards became insolvent. And, by agreement of parties, the fact was admitted on the hearing, that, in 1844, after the commencement of the suit, the complainants had applied to the Register and Receiver of the Clarksville land office for the entrance money ($150) paid by Morse for tbe tract in question which Sau-grain held by virtue of his prior entry, and it was paid over to them by the land officers. That they applied for this money by virtue of the conveyance executed to them by Morse, and appropriated it to their own use. The court below decreed a perpetual injunction of the judgment obtained by Alexander. Upon the facts presented, there can be no question, as between the complainants and Morse or his administrator, but that they would be entitled to relief either by way of compensation or deduction to the amount of $1,200, the value of the tract of which they were evicted, with interest from the time of the sale; and in this view of the case, it would be immaterial what representations were made by Morse, or what knowledge the complainants had of any defect in his title. His covenant of warranty was a positive contract, and upon eviction from all or any of the tracts, the complainants, as against their grantor, would be entitled to compensation to the extent of the injury sustained, and to that extent could have defeated any recovery of the unpaid purchase money by him. Their right to this relief would not require a re-scision of the contract, but would rest upon the ground of a partial failure of consideration, and this would have been available to them in equity if not at law. Wheat, use, &c. vs. Dotson, 7 Eng. 699. But the administrator of Alexander insists that a different rule would apply in a contest between him and the complainants; and the question is presented, whether and to what extent the equitable defences which the maker of a bond or note may have against the payee, are available to him as against the assignee. ' There is no proof as to the circumstances attending the sale and conveyance of the land — whether Morse represented his title to be good, or the complainants knew it to be defective as to this tract. The answers as to this, being upon information, cannot be evidence for the defendants. And so of the affirmative allegation in the answer of the administrator of Morse, that since the filing of the bill, the complainants had paid $40, in satisfaction of his claim for another portion of the purchase money of the land, there is no proof, and being new matter not responsive to any allegation in the bill, must be disregarded. The presumption is therefore that the sale was a fair one for a fair price, Morse believing that he was conveying, and the complainants that they were accepting, a good title. On the other hand, it may be fairly stated that Alexander, the assignee of Morse, became an innocent holder of the obligation for $600, for value received, and without notice of any subsisting equity between the complainants and Morse, and it is urged, upon the supposition that a loss in consequence of the insolvency of Morse, must fall upon one of two innocent parties, that the complainants should bear that loss, inasmuch as, by the intrusting Morse with their negotiable note under seal, for the payment of money, they nut it in his power to raise money upon it, and defraud or injure any one who might give value for it as a valid security. Such would be the doctrine of the law merchant as to negotiable paper before due; and the enquiry presents itself, to what extent have we adopted or does the law merchant prevail in this State ? By the Missouri territorial statute enacted in 1807, and in force in this State until 1837, bonds, bills and promissory notes for money or property, were assignable so as to authorize the assignee to sue in his own name as the original holder could do, and recover the amount actually due at the time of the assignment, and which the assignor could not release, with the proviso that nothing in the act should be so construed as to change the nature of the defence in law that any defendant might have against the as-signee or the original assignor. (Ter. Dig. 74.) This court, in commenting upon this statute, in the case of Gamblin et al. vs. Walker, (1 Ark. 222,) considered “ that this act did not profess to be declaratory of what was the law, but plainly imported to be the introduction of a new rule.” It did indeed abrogate the common law of maintainance as to all such choses in action, but the assignable quality given to them was the adoption of a rule altogether diiferent from the law merchant. Such an assignment ordinarily implied that the assignor had title to the instrument, that it was a bona fide and valid security for the amount it purported, and that he would be responsible in case of the insolvency of the maker, where the assignee, after using due diligence, had failed to enforce payment by suit against him. This, in general terms, may be said to have been the law not only in Missouri and Arkansas, but of most of the western States. And they have adhered, though with various modifications to what appears to have been the leading feature in this system, doubtless congenial to the wants or to the prejudices of an agricultural people, viz : that the contract should be enforced according to the rights as they subsisted between the original parties to it, so that the maker of a bond or note should never be required to pay any more than what was really and jus tty due upon it. In Block vs. Walker, (2 Ark. R. 8,) the point decided was, that, under the statute, the assignee must sue in his own name, because he had acquired the legal title, and he would not be allowed, by suing in the name of the assignor, to his use, to deprive the defendant of any supposed defence he might have against the assignee. The court, however, deemed it necessary to construe the whole statute, and, in doing so, they declared that an assignment according to the statute, is an agreement or contract in writing, entered into between the assignor and assi-gnee, for a valuable consideration; that it was equivalent to drawing a new bill in favor of the assignee on the original obli-gor, but with the marked difference from the law merchant, that “the assignee stands in precisely the same relation to the obligor after the assignment as the assignor did before the transfer was made;” and after quoting the clause of the statute reserving to the defendant any defence which he might have in law against the assignee or the original obligor, the court say, “the statute is express and peremptory on these points, and it leaves no room for doubt or construction in regard to them.” in Small vs. Strong, (2 Ark. R. 199,) the case was that Small made his note to Knight & Bell, who assigned it to Strong ; but previous to the assignment to Strong, a note, made by Knight & Bell, to one Harrison, had been assigned by him to Small, and the question was whether, in a suit by Strong, Small was entitled to off-set the demand which he had so acquired against Knight & BelL The court, in an elaborate opinion, decided that he was not entitled to the set-off, for the reason that the territorial statute only contemplated a reservation to the maker of the bond or note of such defqnces as were connected with or sprung out of the obligation or contract itself, differing in this respect from the statutes of Virginia and Kentucky, which expressly allowed all discounts or off-sets, and because the defendant Small was not aided by the territorial statute of set-off, which required the debts to be mutual and by a privity of contract between the plaintiff and defendant. The whole reasoning of the case, however, would make it a strong authority to the extent of the equity set up by the complainants in the case now under consideration, because their defence is one connected with or growing out of the original contract. The statute of assignments adopted in 1837, (Dig-, chap. 15,) and governing this transaction, adopted the territorial statute as far as it went; but it goes farther, and as if manifesting the intention of the law-makers and obviating the difficulty suggested in Small vs. Strong, provided that nothing contained in the act should change the nature of the defence, or prevent the allowance of discounts or off-sets either in law or equity, that any defendant may have against the original assignpr previous to the assignment, of against the plaintiff or assignee after the assignment. But this statute contains a further and very important feature, introductory of a new rule, by which the whole character of the contract, as between the assignor and assignee, or endorser and endorsee, might be materially changed. By the 9th section of this act, the holder of any bond,' bill or note for the payment of money alone, by using due diligence in demanding payment of the maker or acceptor, and giving due notice of nonpayment to the endorsers or assignors, may make them/equally liable with the original obligor, maker or payee of such instrument, and all the prior parties may be sued together or separately. So far as the endorser or assignor is concerned, the equities reserved to the original maker or obligor can have no application, and it would seem to be a qualified adoption of the law merchant, indeed an extension of it to writings obligatory as well as bills and notes. Qualified in as much as we conceive the equities of the maker or party primarily liable are reserved to him, differing materially in this respect from the law merchant, the marked characteristic of which is that the consideration of a bill or note, in the hands of a bona fide holder in the usual course of business, cannot be enquired into or impeached, unless the consideration be so illegal as to avoid the security. On the other hand, it seems to be the intention and effect of this statute to make the liability of all the subsequent parties to a negotiable instrument conditional, as at the law merchant, upon due presentment and notice, leaving their liability, where the holder did not choose to fix it by demand and notice, as it previously existed under our law. So that, even the original maker, or party primarily liable could, in any case, successfully resist payment on the ground of fraud, failure of consideration, or equitable discount existing between him and his obligee or payee, yet the subsequent assignors or endorsers, upon receiving due notice of presentment and refusal, would remain liable to any holder, as under the law merchant, upon their contracts of endorsement. Thus, in the case now before the court, if Morse had been duly notified of demand and refusal, there can be no doubt he would have become primarily liable to his assignee Alexander, notwithstanding the consideration of the obligation as between the obligors and himself, had wholly failed, and without regard to any equitable defence or discount as between them. The law merchant being thus and to this extent introduced by the act of 1837, the application of it has come before this court in several cases, where it was, as we conceive, properly held that, by analogy to the law merchant, its rules respecting the rights and remedies of the holder, the manner of making the endorsement, the time and mode of presentment and notice are applicable as if expressly adopted, which, was done by the act of 1838, (Dig., ch. 25,) as to days of grace, presentment and notice in the case of all bills of exchange, and of bonds and notes payable in Bank. (Buckner vs. R. E. Bank, 5 Ark. Rep. 541. Buckner vs. Greenwood, 1 Eng. 207. Sterling & Snapp vs. Bender, 2 Eng. 202. Ruddell & McGuire vs. Walker, ib. 459. Jones vs. Robinson, 3 Eng. 485. Feimster vs. Smith, 5 Eng. 496. Jones vs. Robinson, 6 Eng. 510.) In the latter case, it was held that an endorsement of a note after due, is equivalent, so far as the contract of endorsement is concerned, to drawing a new bill or note payable on demand, and a corresponding degree of diligence as at the law merchant is required on the part of the holder to fix the liability of the endorser. But in none of these cases was the question raised or decided as to what equities the statute reserved to the defendant; yet the very adoption and extension of the law merchant, as we have seen, and the discussion of its rules in the courts, are calculated to create the idea of confusion in the law; and it is not strange that an innocent holder of a negotiable security, as if under the law merchant, should now claim the protection of that law to the full extent. But the equities reserved by the statute to the original obligor, appear to have been always regarded and protected by the court. When this cause was up before, the court, (1 Eng. 308,) as a reason for requiring the answer of Morse to be in before the injunction was dissolved, held that the rights and liabilities of the makers were not changed by the assignment; they were not deprived of any defence against the note, either in law or equity, which they possessed against the assignor before the assignment, and that, by the assignment, Alexander acquired all the rights and interest of Morse created by the note, and became subject to the same defences as the assignor would be. In the case of Black vs. Bowman Trammell, (4 Eng. 505,) the question now under consideration was expressly decided, and the court say of the statute that it was intended, as it expresses, to protect the maker of the note, and afibrd him the full benefit of his defence either in law or equity, and although the note, on its face, may give no indication of the defence to be offered, the assignee is understood to take it subject to all and every defence which the maker could offer at the time of the assignment. In that case, Trammell rested his claim upon the ground that he was an innocent holder of the note assigned to him for value and before due. To the same effect is the case of Smith vs. Capers, decided at January term, 1852. We must, therefore, take it as the law of this State, that the caveat does not rest upon the maker of negotiable paper, to beware how he becomes instrumental in causing it to be putin circulation, to make due enquiry, and to be cautious in protecting himself against loss or injury, but that the holder takes it at his peril, and with the risk of any latent equity that the maker could set up in any suit against the payee or obligee. And the grounds and reasons of this decision are thus fully stated, because the law affecting negotiable paper is, as we have seen, in many respects, anomalous. And because, if any reform is needed by the growing wealth and commerce of the State, in aid of credit and public confidence in such securities, it may be understood that the duty of such reform devolves upon the legislature and not upon the courts. The only remaining point to be considered is, as to what effect had the act of the complainants in demanding and receiving the entrance money of the tract previously entered by Saugrain. This was done long after the rights of the parties had become fixed, and indeed after the filing of the bill; whether, with the consent of Morse or not, does not appear; and we do not see how it can aid the equity of Alexander. If admissible for any purpose, it would only be to raise a presumption that the complainants knew of the defect in the title, and intended to abide by such title as Morse had. But as the law is understood by the court, the express warranty of Morse was a positive contract which negatives any such presumption, and would entitle the complainants to relief against Morse, no matter what the verbal agreement or understanding of the parties may have been. It may be that this money belongs to the estate of Morse, and should go to his general creditors; yet Alexander has no cause in this proceeding to complain of the act, unless it had occurred prior to his purchase of the writing obligatory, and was calculated to mislead him. Because, if the obligor does#any act of commission or omission calculated to deceive the assignee, or whereby the assignee is induced to become the purchaser of the paper, he would be estopped from asserting any equity of which he was cognizant, or ought reasonably to have been cognizant of at the time as against the assignee. But this principle can have no application here; and we are bound to conclude that the demand and receipt of this money was an effort on the part of the complainants to save themselves against the insolvency of Morse, and.;this amount, together with the judgment by Alexander, would not be sufficient to indemnify them against the value of the tract to which the title failed, and interest on the amount from the time of the sale. Seeing no error in the decree, the judgment of the court is, that it be in all things affirmed.